IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | |
|---|---|
| LARY LEHMAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 06-4020-CV-C-NKL |
| | ) |
| UNITED PARCEL SERVICE, INC., | ) |
| | ) |
| Defendant. | ) |

ORDER

Pending before the Court is Defendant United Parcel Service's ("UPS") Motion for Summary Judgment [Doc. # 43].  UPS has also filed Motions to Strike Plaintiff Lary Lehman's ("Lehman") Response to its Statement of Uncontroverted Facts [Doc. # 63] as well as several of the exhibits attached to his Suggestions in Opposition to Summary Judgment [Doc. # 64].  Because the Court finds that summary judgment is warranted even with the challenged exhibits and response, the Court denies the Motions to Strike and grants the Motion for Summary Judgment.

**I.     Background**

Lehman worked as a package car driver and fill-in feeder driver at the UPS facility in Sedalia, Missouri.  In his primary position, he picked up and delivered packages to UPS customers along a prescribed route.  As a fill-in feeder driver, he occasionally drove a tractor-trailer of packages from one point to another.  Both positions are physically

1

strenuous and required that Lehman be able to lift packages weighing up to seventy pounds.

On March 12, 2004, Lehman suffered a workplace injury while he was filling in as a feeder driver.  Although an ambulance came to the scene of the accident, Lehman chose to return to the Sedalia facility with his business manager, Donnell Wilson, whom Lehman had called after the accident.  When he got back to UPS, Lehman checked in with Feeder Driver Manager Rick Meierotto who told him he was "terminated" until an investigation could be done.  UPS contacted Lehman three days later, after it concluded that the accident was unavoidable, and told him he could come back to work.  Upon his return, Lehman reported pain in his neck to Dr. Sharp, UPS's on-site doctor, who gave him a twenty-five pound lifting restriction.  Because his regular position entailed lifting in excess of twenty-five pounds, Lehman reported to temporary alternate work ("TAW").  While on TAW, Lehman did some office work, delivered some UPS air packages with his own personal vehicle, answered the phone and sent messages to the drivers through a communication board.  Lehman performed TAW for approximately one month and was then placed on workers' compensation through which he continued to see Dr. Sharp for the injury to his neck and back.

At the end of May 2004, Dr. Sharp recommended physical therapy and remarked that Lehman could be a surgical candidate or perhaps treated with an epidural block. Lehman was referred by Liberty Mutual, UPS's workers' compensation administrator, to see Dr. Mirkin, an orthopedic surgeon.  Dr. Mirkin evaluated Lehman on May 28, 2004,

and prescribed half days of work hardening–a form of physical therapy involving limbering up with stretching and walking, the application of hot packs and the application of electric stimuli–for two weeks at a location near his home in Sedalia.  On his second visit, Dr. Mirkin increased the work hardening to full days for two weeks.  On his third visit, Dr. Mirkin prescribed a work capacity/functional capacity evaluation to try to determine Lehman's ability to return to his job at UPS.  After reviewing the work capacity evaluation findings on July 9, 2004, Dr. Mirkin placed Lehman on a permanent lifting restriction of twenty pounds and concluded that he had reached maximum medical improvement.  Per the terms of the Collective Bargaining Agreement between UPS and the workers' union, once an employee is rated at maximum medical improvement, he is no longer eligible to receive workers' compensation.

Dr. Mirkin's assessment was reported to Kris Kershaw, then District Case Management Supervisor, who concluded that the permanent lifting restriction would prevent Lehman from performing the essential job functions of his driver position. Kershaw informed Donnell Wilson that Lehman could not return to work.  Wilson met with Lehman on July 15, 2004, to tell him that due to the permanent twenty pound lifting restriction, there was no longer a job for him at the Sedalia facility.  Although Lehman requested an ADA accommodation, he was then placed on inactive employment status, where he continued to receive his benefits and vacation pay.

On July 19, 2004, Lehman filed a claim for workers' compensation benefits seeking further medical care for his work-related injury as well as a finding of permanent

3

partial disability. Around the same time, he filed a grievance with the Union challenging the Company's decision. Lehman pursued his grievance in accordance with the Collective Bargaining Agreement, but it was denied at each step. The Bi-State panel eventually upheld UPS's actions because Lehman's claim was a workers' compensation issue.

Lehman's workers' compensation attorney sent him to see Dr. Stuckmeyer for an independent medical examination on August 31, 2004. Although Dr. Stuckmeyer concluded that Lehman had not reached maximum medical improvement, he agreed with Dr. Mirkin that Plaintiff should be subject to a twenty pound lifting restriction. That restriction has never been lifted. Lehman is not currently under the care or treatment of any doctor.

Despite his accident, Lehman has taken vacations with his family, plays guitar, is able to shower, dress and groom himself, exercises approximately five times a week with an athletic ball, and walks approximately three times a week for exercise for approximately fifteen to twenty minutes at a time. He campaigned for city councilman in the fall 2004 and spring 2005 by walking from door to door. He can walk steps, if he takes his time with them, and assists his wife in household activities, such as putting dishes in the dishwasher and regularly cooking for his family.

Since the accident, Lehman has gone back to school full-time in the hopes of attaining a bachelor's degree. From March to May 2005, he also worked as an editor for Print Lynx , a year-book publisher, a computer job that required him to sit at a desk for

long periods of time. In May 2005 he began working on and off for Guardsman Security, with a placement at Bothwell Hospital. During summer 2006, he worked approximately three days per week, on eight-hour shifts, although currently he is just acting as a fill-in. His job entailed sitting at a desk in the emergency room and walking around the floor of the ER once every two hours. Lehman also worked as a substitute teacher on a fairly regular basis in April and May 2005, and he has informed the school that he will also be available for substitute teaching for the 2006-2007 school year.

Lehman is taking courses towards two bachelor's degrees at Central Missouri State University in criminal justice and computer information systems, which he started in the fall 2004. He is taking twelve hours of classes this semester, and he drives himself to and from classes in Warrensburg, Missouri, on Tuesdays and Thursdays, which takes about 35 minutes. He sits in classes from about 9:00 a.m. until 3:15 p.m. with two 15 minute breaks in between. Because he has problems sitting that long, he occasionally gets up and stretches or walks around for a minute.

Other than those listed above, Lehman has not applied for any other jobs since leaving UPS because he is trying to finish school. He is not currently looking for another position because he spends all of his time taking college courses, filling in as a security guard and as a substitute teacher.

On June 20, 2006, Lehman received a letter from UPS stating that he was being administratively separated from the Company in accordance with UPS's policy requiring administrative separations for employees who do not return to work within two years.

5

## II. Discussion

### A. ADA claims

To withstand summary judgment on his ADA claims, Lehman must first make a prima facie showing (1) that he is disabled within the meaning of the ADA, (2) that he is qualified, either with or without reasonable accommodation, to perform the essential functions of the job at issue, and (3) that he suffered an adverse employment decision because of his disability. *Treanor v. MCI Telecomms. Corp.*, 200 F.3d 570, 574 (8th Cir. 2000).

#### 1. Whether Lehman is Disabled Within the ADA

A person may be considered disabled for ADA purposes in one of three ways: if he has a physical or mental impairment that substantially limits one or more of the major life activities of such individual; if he has a record of such an impairment; or if he is regarded as having such an impairment. *Fjellestad v. Pizza Hut of Am., Inc.*, 188 F.3d 944, 948 (8th Cir. 1999) (citing 42 U.S.C. § 12102(2)(A)-(C)).

Lehman has not offered sufficient evidence from which a reasonable juror could find that he has a physical or mental impairment that substantially limits any major life activity. For an impairment to be "substantially limiting," it must render an individual unable to perform a major life activity that the average person in the general population can perform, or it must significantly restrict the condition, manner, or duration under which an individual can perform a particular major life activity as compared to an average person in the general population. *Id.* (citing 29 C.F.R. § 1630.2(j)(1)(i)-(ii)). Courts

6

consider the following factors when determining whether a person is substantially limited in a major life activity: (1) the nature and severity of the impairment; (2) its duration or anticipated duration; and (3) its long-term impact. *Id.* (citing 29 C.F.R. § 1630.2(j)(2)(i)-(iii)). Such a determination must be made on a case by case basis. *Id.*; *Doane v. City of Omaha*, 115 F.3d 624, 627 (8th Cir. 1997).

Due to his neck and back injuries, Lehman has been given a permanent 20 pound lifting restriction which he argues substantially limits the major life activities of lifting and working. The Eighth Circuit has consistently held that a weight restriction on lifting, without more, is not a substantial limitation on a major life activity. *Nuzum v. Ozark Auto. Distribs.*, 432 F.3d 839, 844 (8th Cir. 2005); *Wenzel v. Missouri-Am. Water Co.*, 404 F.3d 1038, 1041 (8th Cir. 2005) ("A lifting restriction, without more, is not a disability."); *Conant v. City of Hibbing*, 271 F.3d 782, 785 (8th Cir. 2001) (per curiam) ("This court has repeatedly held that the type of work restriction at issue in this case [no lifting more than 30 pounds and no repeated bending or squatting] does not amount to a 'disability' within the meaning of the ADA."); *Brunko v. Mercy Hosp.*, 260 F.3d 939, 941 (8th Cir. 2001) ("Although lifting itself is identified as a major life activity, this court has held that a general lifting restriction without more is insufficient to constitute a disability within the meaning of the ADA."); *Snow v. Ridgeview Med. Ctr.*, 128 F.3d 1201, 1207 (8th Cir. 1997) ("While lifting is noted under the regulations as a major life activity, a general lifting restriction imposed by a physician, without more, is insufficient to constitute a disability within the meaning of the ADA."). However, lifting may be part of

7

"a constellation of such basic motor functions . . . that together represent a major life activity." *Nazum*, 432 F.3d at 845. In determining whether the constellation of affected motor functions is a major life activity, the Eighth Circuit applies the standard announced in *Toyota Motor Mfg., Ky. v. Williams*, 534 U.S. 184, 200 (2002), which requires a plaintiff to show that his restriction "prevents or severely restricts" particular tasks that are "central to most people's daily lives." *Wood v. Crown Redi-Mix, Inc*., 339 F.3d 682, 685 (8th Cir. 2003).

Lehman has testified that since his accident he has impaired vision three to four times a week preventing him from driving fifteen to forty minutes at a time; difficulty turning his head and pain when he looks up; muscle aches in his neck and his back; difficulty walking on any uneven ground; difficulty sleeping due to pain 3-5 times a week; an inability to walk upstairs without holding a handrail; difficulty standing or sitting for more than an hour; an inability to take a bath (though he has no difficulty with showers); an inability to jog, bike, play sports with his children, hunt or fish; and an inability to do many household chores, such as cleaning the bathroom, vacuuming, laundry, garbage, gardening, mowing his lawn, working on cars, walking the dog, repairing his roof, and cutting wood. However, despite the pain associated with many of these activities, Lehman has also testified that he still exercises daily, takes walks with his wife, drives, and sits through classes. Since leaving UPS Lehman has also worked part time as an editor for a year-book publisher, as a security guard and as a substitute teacher. He has not looked for other work because he spends most of his time in class. The

difficulties listed above have not prevented him from driving to or from work or sitting through classes, though he does have to stand occasionally during class and move around. His difficulties have not prevented him from shopping or taking walks with his wife (though he can't hold the leash when they take the dog). Although his sleeping is disrupted a few times a week, ibuprofen or aspirin usually stops the pain and most times he simply changes sleeping positions and falls back asleep. Lehman can no longer bike, play sports or repair his roof or his car, but such recreational activities and home and auto maintenance are not major life activities within the meaning of the ADA. *See Weber v. Strippit, Inc*., 186 F.3d 907, 914 (8th Cir. 1999). In short, no reasonable juror could find from the evidence before the Court that Lehman is prevented or severely restricted from performing any particular tasks that are central to most people's daily lives.

### 2. Whether Lehman Was Regarded as Having a Disability

Even if a plaintiff has no actual disability within the meaning of the ADA, he may nonetheless be considered disabled if his employer regarded him as having a disability. *Sutton v. United Air Lines*, 527 U.S. 471, 489 (1999); 42 U.S.C. § 12102(2)(C). A plaintiff may demonstrate that he was regarded as disabled in one of two ways: (1) by showing that his employer mistakenly believed that he had a physical impairment substantially limiting one or more major life activities, or (2) by showing that his employer mistakenly believed that an actual, nonlimiting impairment substantially limits one or more major life activities. *Sutton*, 527 U.S. at 489. UPS regarded Lehman as having a 20 pound lifting restriction placed on him by his physician. Although such a

9

restriction is not itself a substantial limitation on any major life activity, Lehman may still be covered by the ADA if UPS mistakenly considered his lifting restriction to be a substantial limitation.

The ADA's provisions addressing perceived disabilities were "intended to combat the effects of archaic attitudes, erroneous perceptions, and myths that work to the disadvantage of persons with or regarded as having disabilities." *Brunko v. Mercy Hospital*, 260 F.3d 939, 942 (8th Cir. 2001). Normally, if a restriction is based upon the recommendations of physicians, then it is not based upon myths or stereotypes about the disabled and does not establish a perception of disability. *Breitkreutz v. Cambrex Charles City, Inc.*, 450 F.3d 780, 784 (8th Cir. 2006). However, where a non-limiting impairment is noted by a physician but an employer mistakenly believes such restriction substantially limits the employee, then the employee is regarded as disabled with the ADA. *See Ollie v. Titan Tire Corp.*, 336 F.3d 680 (8th Cir. 2003). In *Ollie,* the plaintiff was hired to work at a tire plant pending a physical exam. The examining doctor noted in his report that Ollie "is medically able to do the essential functions of the job with accommodations listed below . . . Pt. has asthma. May have difficulty in areas [with] dust or fumes." *Id.* at 683. When the hiring manager received the doctor's report, she made the following notation, "Asthma, no working where dust or fumes." Because the hiring committee believed that dust and fumes permeated the entire factory, they concluded that the only place Ollie could work would be in the office. But since there were no available jobs in the office, the company rescinded the job offer. *Id.* After getting a job with a different

10

Case 2:06-cv-04020-NKL   Document 73   Filed 02/22/07   Page 10 of 19

company in the same factory building despite his asthma, Ollie sued Titan Tire under the ADA and convinced a jury that the company had regarded him as disabled. Affirming that verdict, the Eighth Circuit distinguished several cases in which employees had actual limitations placed on their working abilities making it impossible for them to perform all the functions of certain positions. *See Wooten v. Farmland Foods*, 58 F.3d 382 (8th Cir. 1995) (doctor's note restricted work activities to light duty, no work with meat products, no work in cold environment, and lifting twenty pounds maximum); *Conant v. City of Hibbing*, 271 F.3d 782, 785-86 (8th Cir. 2001) (doctor's report stated that Conant should not lift more than thirty pounds and should not bend or squat); *Brunko v. Mercy Hospital*, 260 F.3d 939, 942 (8th Cir. 2001) (physician issued permanent lifting restriction of no more than forty pounds). The court of appeals noted that "[a]lthough the restrictions [in those cases] precluded the employees from performing the specific jobs for which they had applied or in which they had previously been working, they were not excluded from a broad range of similar jobs which did not have the same unique requirements." *Ollie*, 336 F.3d at 686. By contrast,

> Titan Tire . . . did not rely on a doctor's restrictions in the same way as the employers in *Wooten, Conant*, and *Brunko*, but rather relied on its own interpretation of the doctor's advice and its own opinion that Ollie could not perform all essential functions of any available job. It did not see Ollie as precluded from performing only one type of job because of his restrictions, but rather concluded that he was precluded from performing any job which would put him in contact with dust or fumes.

*Id.* at 686-687.

11

Lehman was placed on a permanent 20 pound lifting restriction by his physician. Based on that limitation, UPS determined that he was unable to perform the essential functions of his previous job as a delivery driver due to the 70 pound lifting requirement of that position. UPS told Lehman that he could not return to work at the Sedalia facility. He argues that, like Ollie, he was regarded as unable to work in any position due to his lifting restriction even though there would be positions for which he was still qualified, either in Sedalia or elsewhere within UPS. However Lehman has adduced no evidence of other available positions without lifting restrictions for which he was qualified. Nor has he adduced any evidence that his restriction did not actually preclude him from carrying out his former job responsibilities or those of any other position for which he may have been qualified.

The salient fact in *Ollie* was that Titan Tire mistakenly believed he could not work anywhere in the plant *despite* a doctor's statement that he was essentially able to work there. In the present case, the doctor's statement was that Lehman was *not* able to perform any job requiring lifting over 20 pounds. In that respect, Lehman's facts are more analogous to those in *Brunko*. In that case, a nurse who was given a 40 pound lifting restriction after a back injury was terminated because the hospital where she worked had a 70 pound lifting requirement for all staff nurses. *Brunko*, 260 F.3d at 941. Unlike the employer in *Ollie,* Bunko's hospital encouraged her to apply for and offered her other available positions in the hospital, but Brunko accepted employment elsewhere instead. The Eighth Circuit held that Bunko's termination was based on her actual lifting

restriction and not on "myths or archaic attitudes about the disabled." *Id.* at 942. The fact that the hospital encouraged her to apply for other positions also demonstrated that it did not consider her substantially limited in a broad class of jobs. *Id.* Although UPS did not encourage Lehman to apply for other positions within the company, there is no evidence that Lehman sought another position within UPS without a 70 pound lifting requirement, that such a position was available at the time, that he was qualified for it, or that UPS denied him such position on the mistaken belief that his lifting restriction would preclude him from performing the essential functions of the job. In short, no reasonable juror could believe that UPS regarded Lehman as disabled within the meaning of the ADA.

Because Lehman was neither disabled nor regarded as disabled within the meaning of the ADA, he cannot make a prima facie showing of disability discrimination. Summary judgment in favor of UPS is therefore appropriate.

### B. Retaliation Claims

In addition to his direct discrimination claims, Lehman alleges retaliation in violation of the ADA for exercising his rights under that statute. Retaliation claims are analyzed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*. *Mershon v. St. Louis Univ.*, 442 F.3d 1069, 1074 (8th Cir. 2006). The initial burden of production falls on a plaintiff to make a prima facie showing that (1) he engaged in a statutorily protected activity, (2) an adverse action was taken against him, and (3) a causal connection exists between the adverse action and the protected activity. *Id.* If the plaintiff makes such a showing, the burden shifts to the employer to proffer a legitimate,

13

nondiscriminatory reason for the adverse action. *Id.* If the employer does so, the burden of production shifts back to the plaintiff to show that the proffered reason was pretextual. *Id.*

The parties agree that Lehman engaged in protected activity by filing a grievance when he was not allowed to return to work and by requesting a reasonable accommodation under the ADA. Though it is not entirely clear from his brief what adverse employment actions he attributes to retaliation, at the very least Lehman claims that UPS retaliated against him by terminating his employment, by failing to accommodate his disability, by failing to allow him to return to work, by "deliberately refus[ing] to *allegedly* respond" to a request for accommodation for two months during which time Lehman was not paid, by attempting to keep Lehman from receiving unemployment compensation, and by trying to condition the settlement of his workers' compensation claim on a global waiver of all claims against UPS.

Lehman's claims that UPS failed to accommodate his disability, failed to allow him to return to work, and "failed to allegedly respond" to his request for accommodation, all in retaliation for making the request and filing a grievance, fail as a matter of logic. Lehman was neither disabled nor regarded as disabled and thus not entitled to a reasonable accommodation. The absence of such an accommodation therefore cannot be an adverse employment action even under the liberal standard of *Burlington Northern and Santa Fe Ry. Co. v. White,* 126 S. Ct. 2405, *2415 (2006). *Cf. Burch v. Henderson* 2000 WL 97184, *20 (W.D.Mo.) (W.D.Mo., 2000) ("If no

14

accommodation was otherwise forthcoming from defendant, plaintiff cannot argue that her protected activity 'caused' the absence of a reasonable accommodation. Plaintiff was neither disabled nor perceived as such, and that is why defendant did not accommodate her until it discovered otherwise.").

Moreover, Lehman was told that he could not return to work on July 15, 2004. It was after this date that he requested an accommodation. He did not file his grievance until July 19. Thus, UPS's decision that he could not return to work could not have been caused by the request for an accommodation or the grievance since both came later in time. Lehman's eventual termination occurred in July 2006, almost two years after he made his request for accommodation and filed his grievance. The temporal gap is too great to raise any inference that the termination was caused by the request or the grievance as opposed to the lifting restriction which removed Lehman from the workforce before he requested accommodation or filed his grievance. *See Wallace v. Sparks Health Sys.*, 415 F.3d 853, 859 (8th Cir. 2005) (finding one year between complaint and adverse employment action "weakens the showing of the required causal link"); *Trammel v. Simmons First Bank of Searcy*, 345 F.3d 611, 616 (8th Cir. 2003) ("the time interval of more than two months is too long to support an inference of causation").

The last two alleged adverse employment actions, UPS's attempts to keep Lehman from receiving unemployment compensation and to condition the settlement of his workers' compensation claim on a global waiver of all claims against UPS, also fail. The only evidence Lehman has produced that UPS attempted to keep him from receiving

15

unemployment benefits is inadmissible hearsay statements contained in his own deposition and declaration. As for conditioning a settlement on a release of all claims, Lehman has provided the Court with no authority that would hold that an offer of settlement which Lehman was under no obligation to accept may be considered an adverse employment action. Summary judgment is therefore granted to UPS on Lehman's retaliation claims.

### C. Workers' Compensation Claims

Missouri's Workers' Compensation Law provides that "No employer or agent shall discharge or in any way discriminate against any employee for exercising any of his rights under this chapter. Any employee who has been discharged or discriminated against shall have a civil action for damages against his employer." Mo. Rev. Stat. § 287.780. To prevail in a retaliatory discharge action under the Workers' Compensation Law, a plaintiff must prove the following elements: (1) plaintiff's status as an employee of defendant before injury; (2) plaintiff's exercise of a right granted by the Act; (3) employer's discharge of or discrimination against the plaintiff; and (4) an exclusive causal relationship between plaintiff's actions and defendant's actions. *St. Lawrence v. TWA, Inc.*, 8 S.W.3d 143, 149 (Mo. Ct. App. 1999).

There is no dispute that Lehman worked for UPS, that he exercised his right by filing for and receiving Workers' Compensation benefits, or that his employment was terminated. Thus, Lehman's initial burden under the three-step *McDonnell Douglas v.*

16

*Green* framework is limited to showing an exclusive causal relationship between his request for benefits and his termination.

Lehman was injured on the job on March 12, 2004. He was temporarily relieved of duty until UPS determined that the accident was unavoidable and permitted him to return to work three days later. Upon his return, the facility doctor gave him a 25 pound lifting restriction and placed him on temporary alternative work for about a month after which Lehman began to receive workers' compensation benefits. Over the next few months, he received various treatments by a variety of workers' compensation doctors until Dr. Mirkin placed him on a permanent 20 pound lifting restriction in early July and found him to have reached Maximum Medical Improvement. UPS told Lehman that he could not return to his job due to the lifting restriction and placed him on inactive employment. Due to the finding of Maximum Medical Improvement, his workers' compensation benefits were terminated. Lehman filed for further workers' compensation benefits on July 19, 2004, seeking further medical care and a finding of permanent disability. He was eventually terminated in July 2006 because he was unable to return to work after two years.

Aside from a few vague emails indicating that UPS was anticipating a finding of Maximum Medical Improvement, that Lehman had previously received workers' compensation for other injuries, and that he knew how the system was "played," Lehman has offered no evidence that his eventual termination was related to his request for or receipt of workers' compensation benefits. However, even assuming that he could

establish a prima facie showing, UPS has offered a legitimate, non-discriminatory basis for his termination, namely that his permanent lifting restriction precluded his return to work. Lehman attempts to rebut UPS's explanation by citing to scores of irrelevant and vague emails, internal documents, and documents from other lawsuits against UPS without any specific reference to what language the Court should consider. Simply providing a massive record does not satisfy Lehman's burden, and the Court will not sort through a voluminous record in an effort to find support for his allegations. *Howard v. Columbia Pub. Sch. Dist.*, 363 F.3d 797, 800 (8th Cir. 2004). Morever, Lehman had applied for and received workers' compensation in the past–including a year-long stretch during which he was unable to work–after which he was allowed to return to his previous job. The lack of evidence adduced by Lehman and the affirmative evidence offered by UPS that it has previously allowed him to return to work once he recovered from another injury, suggests that no reasonable juror could find that UPS retaliated against Lehman for making a claim under the Workers' Compensation Law. Summary judgment must be granted to UPS on this claim as well.

## III.  Conclusion

Accordingly, it is hereby

ORDERED that Defendant UPS's Motion for Summary Judgment [Doc. # 43] is GRANTED. It is further

ORDERED that UPS's Motions to Strike [Docs. ## 63, 64] are DENIED.

18

s/ Nanette K. Laughrey
                                                                NANETTE K. LAUGHREY
                                                                United States District Judge

Dated:  February 22, 2007
Jefferson City, Missouri